## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

DANIEL METAGUE, on behalf of      *
himself and all others similarly situated,

     *

        Plaintiff,

     *

   v.      *          Civil Action No. 8:20-cv-02186-PX

     *

WOODBOLT DISTRIBUTION, LLC,
d/b/a NUTRABOLT      *

        Defendant.      *

         ***

### MEMORANDUM OPINION

Pending before the Court is this consumer protection class action suit is Defendant Woodbolt Distribution, LLC's Motion to Dismiss.  ECF No. 19.  The motion is fully briefed and no hearing is necessary.  *See* Loc. R. 105.6.  For the following reasons, the motion is granted in part and denied in part.

### I.  Background

Defendant Woodbolt Distributions, LLC, ("Woodbolt") manufactures and sells the "XTEND Energy" ("XTEND") line of nutritional powders in a variety of flavors.  ECF No. 16 ¶ 2.  On its website and on XTEND's package labeling, Woodbolt prominently proclaims that XTEND contains "0 calories" per serving.  *Id.* ¶ 20.  The veracity of this pronouncement, and Woodbolt's compliance with United States Food and Drug Administration ("FDA") regulations related to such labeling, are at the center of this lawsuit.

### A.  FDA Regulations

XTEND is a pre-workout energy supplement that promotes "muscle recovery."  ECF No. 16 ¶ 20.  FDA regulations governing the content of labeling for food and dietary supplements cover products such as XTEND.  21 C.F.R. § 101.36 (supplements); *id.* § 101.9 (food).  The

XTEND label describes the supplement as "0 calories, 0 carb and 0 sugar" per serving.  ECF No. 16 ¶ 20.  The label also highlights that it contains "7G BCAA" per serving.  *Id.*  BCAA is shorthand for "branched-chain amino acids," which are organic compounds that combine to form proteins, but which independently may be added to food and dietary supplements for certain nutritional benefits.  *Cf.* 21 C.F.R. § 172.320.  Per the FDA, branched-chain amino acids must be individually listed on the product labeling and may not be represented as "protein."  *See id.* § 101.36(b)(2)(i).

The FDA also regulates labeling of calorie content for products like XTEND.  *See id.* § 101.9(c)(1).  Generally, food products must include on the label the number of calories expressed to the nearest five-calorie increment when the product contains a total of fifty calories per serving, and to the nearest ten-calorie increment when a product contains a higher per-serving total.  *Id.*  Only products that contain fewer than five calories per serving may state that the caloric value is "zero."  *Id.*  Consequently, terms such as "calorie free," "zero calories," or their equivalent, may be used only if the product actually contains fewer than five calories per labeled serving.  *Id.*; *see also id.* § 101.60(a)(4).  Where a product's actual nutritional content exceeds that listed on its label by more than 20%, the product "shall be deemed to be misbranded."  *Id.* § 101.9(g)(5).  Total calories per serving must be calculated using one of six specific FDA-approved methods.[1]

---

[1] Of the six methods only five are relevant to XTEND. They are: (1) calories based on a per gram measurement of protein, fat, and carbohydrate of specific foods and other ingredients (the "Atwater method"); (2) calories calculated by assigning four, four, and nine calories per gram for protein, total carbohydrate, and total fat, respectively; (3) calories calculated by assigning four, four, and nine calories per gram for protein, total carbohydrate, and total fat, respectively, but then subtracting two calories per gram for non-digestible carbohydrates and between zero and three calories per gram of sugar alcohols; (4) using data for specific food factors for particular foods or ingredients approved by the FDA; (5) using bomb calorimetry data. 21 C.F.R. § 101.9(c)(1)(i).

The FDA buttresses its nutritional labeling regulations with several publications to aid the industry in compliance. *See Industry Resources on the Changes to the Nutrition Facts Label*, U.S. Food & Drug Admin., https://www.fda.gov/food/food-labeling-nutrition/industry-resources-changes-nutrition-facts-label (Jan. 27, 2021).[2]  Pertinent to XTEND, the FDA specifically illustrates the label required for dietary supplements of amino acids, making clear that the label must list the amino acids present in the supplement alongside other ingredients, as well as the calories per serving. *See High-Resolution Examples of Different Supplement Facts Labels in the New Format*, U.S. Food & Drug Admin., https://www.fda.gov/media/99158/download (last visited June 15, 2021) at p. 8; ECF No. 16 ¶ 8.

### B.  Metague's Experience with XTEND

In August 2018, Plaintiff Daniel Metague, a Maryland resident living in Montgomery County, purchased XTEND through Amazon.com.  ECF No. 16 ¶ 11.  He was attracted to the product as a "0 calorie" nutritional powder to assist him in achieving certain weight loss goals and addressing his health concerns. *Id.* ¶¶ 9, 11, 16, 24.  Independent testing, however, revealed that XTEND contained roughly forty-two calories per serving, well in excess of the five-calorie cutoff applicable to those products labeled as "zero calories" per serving. *Id.* ¶ 5.  Tests using each of the five FDA methods applicable to measuring caloric content of XTEND also revealed that XTEND exceeds the value represented on the product label by greater than 20%, thus rendering it "misbranded." *Id.*  Woodbolt's own internal emails, reports, analyses, and assessments, corroborate these findings and further demonstrate that Woodbolt has known for

---

[2] The Court takes judicial notice of the labeling guidance and examples published on the FDA's website. See *United States v. Garcia*, 855 F.3d 615, 621 (4th Cir. 2017) (noting that courts "routinely take judicial notice of information contained on state and federal government websites" pursuant to Fed. R. Evid. 201(b)), *overruled on other grounds*; *Diodato v. Mentor Worldwide LLC.*, No. JKB-20-762, 2020 WL 3402296, at *1 n.1 (D. Md. June 19, 2020) (taking judicial notice of FDA documents).

some time the true caloric content of XTEND to be substantially higher than as labeled. *Id.* ¶¶ 38, 65. Metague maintains that had he known the truth about XTEND's caloric content, he would not have purchased it. *Id.* ¶¶ 105–06.

On July 28, 2020, Metague filed the original Complaint on behalf of himself and all other similarly situated consumers in the United States, alleging that Woodbolt committed common law breach of implied warranty, fraud, unjust enrichment, as well as claims under the Maryland Consumer Protection Act, Md. Code., Comm. L. § 13-101 *et seq.* ECF No. 1. The Complaint also averred violations of the unfair and deceptive trade practice laws for 32 other states and the District of Columbia and sought to enjoin Woodbolt from continuing to mislabel and falsely advertise XTEND as a "zero calorie" product. *Id.* ¶¶ 58–61.

Four days after Woodbolt had been served with the Complaint, the Natural Products Association ("NPA") submitted a "citizen petition" to the FDA ("the Petition"). The FDA's citizen petition process permits individuals and organizations to request changes to FDA policies and regulations. Anyone may submit a citizen petition, and in turn, the FDA must either approve or deny the petition's request, or state that agency review will be delayed in light of other FDA priorities. *See* 21 C.F.R. § 10.30.

At the time the NPA filed the Petition, the Chief Legal Officer and General Counsel of Woodbolt also sat on NPA's Board of Directors. *See* ECF No. 22 at 13. The NPA requested that the FDA promulgate new regulations concerning labeling of branched-chain amino acids and caloric content to address a supposed "incongruity" in the regulations and "in light of increasing private litigation[.]" NPA, *Re: Citizen Petition Requesting FDA Amend Nutrition Facts and Supplement Facts Labeling Regulations Pertaining to Caloric*, p. 2, Regulations.gov, https://beta.regulations.gov/document/FDA-2020-P-2134-0001. The Petition explained that the

current guidelines prevented products composed entirely of branched-chain amino acids from listing "protein" as a nutrient in the nutritional facts section of the product's label.  According to NPA, this rule, combined with the requirement that product labels contain the supplement's caloric values, was likely to confuse savvy customers who would question the source of the calories if they did not see "protein" listed.  *Id.* at p. 7.  The Petition concluded by requesting that the FDA "revise the Nutrition Fact rules so that they allow for labels that contain [branched-chain amino acids] to do so without listing the caloric values for those ingredients," and issue guidance to the same effect.[3]  *Id.* at p. 8.

Thereafter, on December 14, 2020, Woodbolt moved to dismiss the Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  ECF No. 10.  In response, Metague filed an Amended Complaint to supplement the facts and add a common law breach of express warranty claim.  ECF No. 16.[4]  Woodbolt now moves to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).  ECF No. 19.

## II.     Standard of Review

A motion to dismiss brought pursuant to Rule 12(b)(6) tests the sufficiency of the complaint.  *See Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted).  In reviewing a motion to dismiss under Rule 12(b)(6), the Court accepts "the well-pled allegations of the complaint as true," and construes all facts and reasonable inferences in the light most favorable to the plaintiff.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).  A complaint's factual allegations "must be enough to raise a right

---

[3] As with other FDA materials, the Court takes judicial notice of the Petition as a publicly available document.  *See, supra* n. 2.

[4] The Amended Complaint inadvertently omitted the short title for Count III which the Court infers is one for fraudulent concealment and omission as averred in the original Complaint.  *Compare* ECF No. 1 ¶¶ 48–57 *with* ECF No. 16 ¶¶ 60–69.

to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007).  In other words, the complaint must set out facts that render the plaintiff's claims facially plausible or permit the reasonable inference that the defendant is liable for the alleged violations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).

If a complaint allegation sounds in fraud, it must meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See Haley v. Corcoran*, 659 F. Supp. 2d 714, 721 (D. Md. 2009).  The rule requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  To satisfy this standard, plaintiffs "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quotation marks and citation omitted).  Fraud allegations that fail to comply with Rule 9(b) warrant dismissal under Rule 12(b)(6).  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).

## III.    Analysis

Woodbolt moves for dismissal on several grounds.  The Court addresses Woodbolt's global challenges to the Amended Complaint before turning to those targeted at individual claims for relief.

### A.  Preemption

Woodbolt argues that Metague's claims are expressly preempted by the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.* because the FDA possesses sole authority to regulate calculation of calories in foods and dietary supplements.  The doctrine of preemption

derives from the Supremacy Clause of the United States Constitution and provides that state laws in conflict with federal law have no force and effect. *See Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007); U.S. Const. art. VI, cl. 2. Preemption may be either express or implied. *See Anderson*, 508 F.3d at 191. Express preemption occurs when Congress' intent to preempt state law is "explicitly stated in the statute's language." *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Implied preemption occurs where compliance with both federal and state regulations is impossible, or where state law "stands as an obstacle to the accomplishment of the full purposes and objectives" of Congress. *Anderson*, 508 F.3d at 191–92 (quoting *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984)). The preemption doctrine applies to state statutory and common law. *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 624 (4th Cir. 2015) (citing *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 324 (2008) ("Absent other indication, reference to a State's 'requirements' includes its common-law duties.")).

In the FDCA, Congress expressly set forth the scope of federal preemption as applied to labeling requirements. *See* 21 U.S.C. § 343 *et seq.* (as amended by the National Labeling and Education Act of 1990). The FDCA provides in pertinent part that no state "may directly or indirectly establish . . . any requirement for nutrition labeling of food that is not identical to the requirement of section 343(q) of this title . . ." *id.* § 343-1(a)(4); *see also id.* § 343(q)(5)(f) (dietary supplements). The FDCA also expressly precludes private causes of action for violations of the Act. *See id.* § 337(a) ("proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by and in the name of the United States.").

These provisions do not, however, necessarily bar parallel actions aimed at addressing false advertising and other deceptive commercial practices. *See, e.g.*, *Hesano v. Iovate Health Scis., Inc.*, No. 13-1960-WQH-JMA, 2014 WL 197719, at *7 (S.D. Cal. Jan. 15, 2014)

("[§ 337(a)] therefore does not preclude states from adopting their own parallel laws and adopting a different mechanism for enforcing those laws"); *cf. POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109, 114–16 (2014) (FDCA did not preclude Lanham Act challenge to misleading food label).  Parallel actions are permitted when the claims impose no greater or different labeling requirements than those required by the FDA.  § 343-1(a)(4).

Woodbolt contends that because the claims centrally concern its compliance with FDA labeling regulations, the claims are preempted.  ECF No. 19-1 at 18-20.  In support, Woodbolt principally relies on *Nemphos v. Nestle Waters N. Am., Inc.*, 775 F.3d 616, 624 (4th Cir. 2015).[5] ECF No. 19-1 at 18–20.  *Nemphos* concerned common law tort and Maryland Consumer Protection Act claims arising from the manufacturer's alleged failure to warn in its marketing for bottled water, infant formula, and baby food, about the risks associated with excessive fluoride intake.  *Nemphos*, 775 F.3d at 618.  The Complaint mounted such challenges even though the manufacturer had followed FDA regulations pertinent to fluoride level warning labels.  *Id.*  In fact, the FDA had previously considered and ultimately declined the *Nemphos* plaintiff's desired regulations that were central to her complaint.  *Id.* at 623.  Because the claims effectively imposed greater obligations on the defendant manufacturers than that required by the FDA, the district court concluded the claims were preempted.  In affirming this decision, the Fourth Circuit emphasized that the labeling requirements set forth in the complaint were "in addition" and "simply not identical to" the FDA's existing regulations.  *Id.* at 625.  The Court reasoned that the warning sought "would oblige Nestlé and Dannon to issue warnings about the risks of dental

---

[5] The Court does not consider helpful Woodbolt's secondary reliance on *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993).  *Mylan Labs* principally concerned whether mere placement of a drug on the market constituted a "false statement" that the drug had received FDA approval, not whether the claims were preempted.  *Mylan Labs.*, 7 F.3d at 1139.

fluorosis for their products in the state of Maryland, even though the FDA resolved not to take that same step." *Id.* at 625–26.

This is not that case. The Amended Complaint avers that Woodbolt failed to follow the *current* FDA labeling regulations as applied to its claimed "zero calorie" product. Indeed, the Amended Complaint makes plausible that under every FDA-approved method for calculating calorie content, XTEND contains substantially more than the "0 calories" per serving touted on the labeling. ECF No. 16 ¶ 5. The Amended Complaint additionally makes plausible that Woodbolt knew this fact to be true as it told the purchasing public the opposite, all to increase XTEND's sales as an effective dietary supplement. Because the claims depend on the current FDA labeling regulations, they are not preempted.

### B. Primary Jurisdiction

Alternatively, Woodbolt maintains that even if the claims are not preempted, the Court should nonetheless dismiss the Amended Complaint pursuant to the doctrine of primary jurisdiction. Woodbolt contends that the Petition before the FDA will clarify the labeling requirements for calorie content applicable to XTEND and so the agency, not the Court, should decide this matter. ECF No. 19-1 at 9–15, 21–24. Woodbolt thus asks that the Court, at a minimum, stay the case pending the FDA's decision on the Petition.

The primary jurisdiction doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body[.]" *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956); *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., MD*, 268 F.3d 255, 262 n. 7 (4th Cir. 2001). Although no fixed formula exists for deciding in which forum the controversy best belongs,

courts often consider: (1) whether the central issues lie within the conventional experience of judges or the agency's particular field of expertise; (2) whether the case involve a matter particularly within the agency's discretion; (3) the risk of inconsistent rulings; and (4) any prior similar applications to the agency. *Eric B. Fromer Chiropractic, Inc. v. Inovalon Holdings, Inc.*, 329 F. Supp. 3d 146, 155 (D. Md. 2018) (citing *Cent. Tel. Co. of Va. v. Sprint Communications Co. of Va. Inc.*, 759 F. Supp. 2d 772, 786 (E.D. Va. 2011)); *Env't Tech. Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996) (quoting *W. Pac. R.R. Co.*, 352 U.S. at 64).

Each of these factors weigh against Woodbolt's requested relief. As to the first factor, Woodbolt frames the controversy as one of "ambiguity" in the regulations that can only be clarified by the FDA. ECF No. 19-1 at 19–20. But Metague rightfully points out that the claims turn not on any purported ambiguity in the regulations; rather, per the Amended Complaint, the regulations are quite clear—Woodbolt must comply with FDA labeling requirements as they pertain to caloric content and branched-chain amino acids. ECF No. 22 at 15. And further, that XTEND exceeds the five calorie per serving threshold necessary to advertise it as a "zero calorie" product. As framed, the claim is not one steeped in the subject-matter expertise of the FDA. It is a purported classic fraud, routinely litigated in this Court. *See Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1124 (N.D. Cal. 2010) (rejecting primary jurisdiction doctrine as to claims of misleading marketing, because "courts are well-equipped to handle" misleading marketing challenges relating to food labeling); *Gubala v. CVS Pharmacy, Inc.*, No. 14 C 9039, 2016 WL 1019794, at *16 (N.D. Ill. Mar. 15, 2016) ("The Court is well qualified to interpret the regulations and to resolve matters regarding allegations of false and misleading representations."); *cf. Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 572–73 (E.D. Va. 2016), *aff'd*, 700 F. App'x 251 (4th Cir. 2017) (evaluating

whether commercial speech about egg production methods was false or likely to mislead consumers under the Lanham Act).  In short, the claims are well within the province of this Court.

The second factor—whether the matter is particularly within the FDA's discretion—also weighs in Plaintiff's favor.  Although the FDA generally maintains discretion over food and nutrition supplement labeling, its reach does not extend automatically to all instances of false advertising and fraudulent labeling.  *See, e.g.*, *In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig.,* 955 F. Supp. 2d 1311, 1349 (S.D. Fla. 2013) (claims relating to defendant's alleged false and misleading representations did not raise "particularly complicated issues that Congress has committed to a regulatory agency") (quoting *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114 (9th Cir. 2008)) (collecting cases); *cf. Sciortino v. Pepsico*, *Inc.,* 108 F. Supp. 3d 780, 813–14 (N.D. Cal. 2015) ("the issues raised by Plaintiffs' claims, particularly its state law misrepresentation claims, do not clearly require FDA's expertise or benefit from uniformity in administration") (collecting cases).  Where, as here, common law fraud and false advertising claims wrap in compliance with relevant FDA regulations, then courts maintain their customary interest in adjudicating consumer protection actions that sound in state and federal law.  These claims, therefore, are not particularly within the agency's discretion.

As to the third factor, the Court discerns little risk of inconsistent rulings.  The FDA has supplied a robust and transparent regulatory scheme for labeling of dietary supplements.  Accordingly, while Woodbolt, faced with defending this suit, may now say such requirements are "unclear," it has not demonstrated that the FDA shares those views.  *Cf.* NPA, *Citizen Petition Requesting FDA Amend Nutrition Facts and Supplement Facts Labeling Regulations Pertaining to Caloric*, p. 7, Regulations.gov, https://beta.regulations.gov/document/FDA-2020-

P-2134-0001.  In fact, the FDA recently updated its nutrition and labeling rules, and with the benefit of robust commentary on protein and amino acid categorization, did not revise the nutritional labeling rules as sought by NPA.  *Id.* at p. 2, 4–5.  At this juncture, the risk of inconsistent rulings is minimal.

The final factor, the status of any relevant pending petition, cuts both ways.  Although the Petition has indeed been filed, it has sat for nearly eight months without action.  And as of April, the agency announced it will delay consideration in light of "other agency priorities and the limited availability of resources."  FDA, *Interim Response Letter from FDA CFSAN to Natural Products Association*, Regulations.gov, https://www.regulations.gov/document/FDA-2020-P-2134-0003 (last visited June 15, 2021).  On this basis alone, the FDA has signaled it will be later rather than sooner before it reaches the Petition.  Thus, this Court sees little value in dismissing or staying this case.[6]  Woodbolt's request to dismiss or alternatively stay the case pursuant to the primary jurisdiction doctrine is denied.

### C.  Claim Specific Challenges

The Court next turns to Defendant's challenges leveled at individual claims.

### 1.  Unfair and Deceptive Practices Under Other States' Laws (Count VII)

Woodbolt urges the Court to dismiss Count VII of the Amended Complaint, which avers that XTEND's mislabeling violates the consumer protection statutes of 32 states and the District of Columbia.  *See* ECF No. 16 at ¶¶ 92–96, p. 28–30.  Woodbolt principally argues that because Metague has suffered no injury in any state other than Maryland, he lacks Article III standing to pursue the state statutory claims on his own behalf and for the putative class.  To be sure Article

---

[6] Additionally, Woodbolt's possible role in the Petition smacks of a self-interested attempt to delay this action if not outright forum shop.  The Court cannot accept as mere coincidence that Woodbolt's General Counsel also sits on the NPA Board, and that NPA happened to submit the Petition just days after Woodbolt was served with the Complaint.  This cozy relationship, although not dispositive, does not go unnoticed.

III standing requires, at minimum, that a plaintiff demonstrate he has suffered (1) an injury in fact, (2) caused by the defendant, and (3) redressable by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  In the class action context, a plaintiff maintains standing to assert a claim on behalf of a putative class where he plausibly alleges that "(1) []he has suffered an injury in fact traceable to a defendant and redressable by the court, *and* (2) h[is] claimed injury is shared in common with others who have been similarly harmed by the same defendant's actions."  *In re Mut. Funds Inv. Litig.*, 519 F. Supp. 2d 580, 586 (D. Md. 2007) (emphasis added).

First with respect to Metague pursuing the claims individually, (ECF No. 16 ¶¶ 97–106), although he demonstrates sufficient injury that is both caused by Woodbolt and redressable, he cannot demonstrate that such injury "satisfies the statutory requirements of the laws of the States which [he is] invoking."  *Mayor of Baltimore v. Actelion Pharmaceuticals, Ltd.*, 995 F.3d 123, 133–34 (4th Cir. 2021) (citing *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011)).  As a "citizen and resident of Montgomery County, Maryland" who purchased XTEND only in Maryland, Metague cannot plausibly pursue consumer protection claims in states other than Maryland.  *See Zaycer v. Sturm Foods, Inc.*, 896 F. Supp. 2d 399, 408–409 (D. Md. 2012);  *Knapp v. Zoetis Inc.*, No. 3:20-cv-191, 2021 WL 1225970, at *9 (E.D. Va. Mar. 31, 2021) ("District courts within the Fourth Circuit have consistently held that plaintiffs do not have standing to bring claims under the statutes or laws of a state where they: (1) do not reside; and, (2) have not been harmed.").

But Metague's individual lack of standing does not automatically warrant, or even compel, that this Court apply the same standing analysis to the putative class.  Indeed, binding precedent directs this Court to reserve such questions for the Rule 23 class certification stage.

After Metague filed his response, the United States Court of Appeals for the Fourth Circuit decided *City of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021).  There, the named plaintiff, City of Baltimore, brought class action claims against the defendant pharmaceutical company for violations of the Sherman and Clayton Antitrust Acts, as well as 25 state antitrust statutes and 20 state consumer protection statutes.  As here, the named plaintiff could not conceivably maintain standing to pursue the other state consumer protection claims on its own behalf.  *Id.* at 134.  Nonetheless, the Fourth Circuit held that "since those (state statutory) counts of the complaint define *class members'* claims, they may be considered in determining whether the plaintiffs' claims raise 'questions of law or fact common to the class' and whether these are 'typical of the claims or defenses of the class,' Fed. R. Civ. P. 23(a), and also whether the common questions 'predominate,' Fed. R. Civ. P. 23(b)(3)."  *Id.*  Such determinations, in short, are best left for the class certification stage.  *Id.* ("If the Rule 23 requirements are met, the plaintiffs could then represent the class members who sustained damages under those laws").

No meaningful difference exists between the nature and structure of the class complaint in *Actelion* and here.  Count VII sets forth the class members' claims under pertinent state consumer protection laws which operate similarly to the Maryland statute as applied to Metague's claim.  *See* ECF No. 16 at ¶¶ 97–106 and pp. 28–30 (Count VII).  And as in *Actelion*, the Rule 23 certification stage provides the proper platform to ascertain whether common questions of law and fact centered on state consumer protection statutes may be appropriate for class, or sub-class, treatment.  The motion to dismiss Count VII is therefore granted as to Metague but otherwise denied.

### 2.   Injunctive and Declaratory Relief (Count IV)

Woodbolt similarly argues that Metague lacks Article III standing to pursue broad nationwide injunctive and declaratory relief.  In this Count, Metague urges this Court to order that Woodbolt cease and desist on the claimed misrepresentations and omissions in XTEND's labeling.  ECF No. 16 ¶ 71.  Woodbolt highlights that because the Amended Complaint fails to make plausible the likelihood of any future harm absent injunctive relief, Metague lacks standing to pursue the claims on behalf of himself or the class.  ECF No. 19-1 at 38 (citing *Lujan*, 504 U.S. at 560–61).  At this juncture, the Court agrees with Woodbolt.

Generally, a plaintiff seeking prospective declaratory and injunctive relief must plausibly allege "a real and immediate threat of repeated injury" in addition to allegations of past harm. *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 455 (4th Cir. 2017); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 111 (1983).  An injury should be "'certainly impending' to serve as the basis for standing in a suit for injunctive relief."  *Griffin v. Dep't of Lab. Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In consumer protection cases, courts are divided over whether averring mere historic injury arising from past misrepresentations is enough to demonstrate impending future injury. The Ninth Circuit has held that where a plaintiff has made plausible her inability to rely on the veracity of defendant's labeling—and so will not purchase the product absent assurance that the labels are accurate—she has pleaded sufficient injury redressable by the requested injunctive relief.  *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969–70 (9th Cir. 2018).  The Seventh Circuit and district courts in the Second Circuit, by contrast, require more than the plaintiff's reliance on past deception from false labeling as grounds to support future injury.  *Camasta v.*

*Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 740–41 (7th Cir. 2014) (quoting *O'Shea v. Littleton,*

414 U.S. 488, 495 (1974) ("Past exposure to illegal conduct does not in itself show a present case

or controversy regarding injunctive relief.")); *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d

453, 464–66 (S.D.N.Y. 2020) (discussing other cases).  District courts in this Circuit cleave more

closely to the latter standing analysis.  They have concluded past harm alone is insufficient; a

plaintiff must make plausible that he will suffer future injury absent the requested injunctive

relief.  *See Hassan v. Lenovo (United States), Inc.*, No. 5:18-CV-105-BO, 2019 WL 123002, at

*6 (E.D.N.C. Jan. 7, 2019); *Palmer v. CVS Health*, No. CCB-17-938, 2019 WL 6529163, at *4

and n. 12 (D. Md. Dec. 4, 2019) (collecting out of district cases).  This case appears particularly

well suited for similar treatment.

  The gravamen of the Amended Complaint is that XTEND is not a zero-calorie product as

advertised.  But this is precisely what Metague and the class wish to purchase in the future—a

zero-calorie supplement.  Indeed, the Amended Complaint states that if Woodbolt "*actually*

*manufactured* the Produce (sic) with *the amount of calories advertised*," the class members

would purchase it; and that "Plaintiff and the absent Class members desire to purchase products

with the *same qualities and attributes* as Defendant *advertised* the Produce (sic) to have."  ECF

No. 16 ¶ 73 (emphasis added).  Read most favorably to Metague and the class, the Amended

Complaint makes plain that they have disavowed any intention of purchasing XTEND in its

current composition—whether it was properly labeled or not—because it is not a zero-calorie

product.  *Id.*  In this regard, requiring Woodbolt to label its XTEND honestly would do nothing

to stave off future injury where the plaintiffs have made clear they will not purchase XTEND

even if properly labeled.[7]  The claim, therefore, must be dismissed.  *Cf. Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

### 3.  Breach of Implied and Express Warranty (Counts I & II)

Woodbolt next argues, correctly, that the implied and express warranty counts must be dismissed for failure to provide the requisite pre-suit notice.  Section 2-607 of the Maryland Commercial Law compels the buyer "within a reasonable time after he discovers or should have discovered any breach," to "notify the seller of breach or be barred from any remedy."  Md. Code, Comm. L. § 2-607(3)(a).  *See also Doll v. Ford Motor Co.*, 814 F. Supp. 2d 526, 542 (D. Md. 2011) (involving a claim for breach of implied warranty); *Palmer v. CVS Health*, No. CCB-17-938, 2019 WL 6529163, at *6 n. 17 (D. Md. Dec. 4, 2019) (discussing notice requirement for breach of express warrant and collecting cases).  The notice must be directed to the immediate seller, and must explain the alleged "breach, the particular goods that have been impaired, and set forth the nature of the nonconformity."  *Doll,* 814 F. Supp. 2d at 542 (citing *Lynx, Inc. v. Ordnance Prods., Inc.*, 273 Md. 1, 17 (1974)); *Lloyd v. General Motors Corp.*, 575 F. Supp. 2d 714 (D. Md. 2008).  Such notice is an express precondition to filing suit and its absence deprives the buyer of "the right of his remedy."  *Lynx*, 273 Md. at 17 (internal quotation marks omitted).

Metague concedes that he did not provide pre-suit notice to Amazon.com, but argues that such notice is not required because Woodbolt had actual notice of the claim through its own internal research and development process and from a previous lawsuit.  ECF No. 16 ¶¶ 38, 52. Yet nothing in Section 2-607 allows for notice to be satisfied in a manner other than as the

---

[7] The general and somewhat contradictory averment that "Plaintiff and the Class members may in the future want to purchase the Product," but they expect that "Defendant will continue to misrepresent or conceal the amount of calories in the Product," does not save the claim when read in conjunction with the more particularly expressed intentions to purchase XTEND only if it were in fact zero-calories, not if it were properly labeled.  ECF No. 16 ¶ 73.

statute requires.  *Cf. Lloyd*, 575 F. Supp. 2d at 723.  Where the state statutory requirements are clear, and the Plaintiff has failed to follow them, the claims must be dismissed.

### 4.  Fraud, Maryland Consumer Protection Act, and Unjust Enrichment (Counts III, V, & VI)

Woodbolt next argues that the fraud-based claims fail to meet the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure.  ECF No. 19-1 at 31–33.  Rule 9(b) requires that "the circumstances constituting fraud be stated with particularity."  Fed. R. Civ. P. 9(b).  The rule "does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exists."  *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991).  As the Fourth Circuit explained in *United States ex rel. Nathan v. Takeda Pharmaceuticals North America, Inc.*, 707 F.3d 451 (4th Cir. 2013), the aims of Rule 9(b) are to provide notice to defendants of their alleged misconduct, prevent frivolous suits, eliminate fraud actions where all the facts are learned after discovery, and protect defendants from harm to their goodwill and reputation.  *Id.* at 456 (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 789–90 (4th Cir. 1999)).  Even under this heightened standard, "[a] court should hesitate to dismiss a complaint . . . if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015) (quoting *Harrison*, 176 F.3d at 784).

The Amended Complaint has pleaded the fraud with sufficient particularity.  The Amended Complaint provides specific time, place and manner of Woodbolt's false advertising. It focuses on those particular aspects of the labeling which are false—calorie content—and explains with great specificity why such "zero calorie" representations were made with

knowledge of its falsity.  Lastly, the Amended Complaint sets forth the particular detrimental reliance, that Metague purchased XTEND precisely because it was a supposed "zero calorie" beverage and relied on such misrepresentations to fulfill his health and fitness goals.  ECF No. 16 ¶ 11.[8]

Woodbolt, presses however, that *In re GNC Corp.*, 789 F.3d 505, 516 (4th Cir. 2015), compels a different result.  *GNC* concerned a dietary supplement label which stated that the active ingredients in the supplement—glucosamine and chondroitin—were "shown to improve joint comfort and function."  789 F.3d at 509.  Plaintiffs filed suit under the Lanham Act, alleging that these representations constituted false advertising.  *Id.* at 515.  The *GNC* complaint conceded, however, that the scientific community remained divided as to whether glucosamine and chondroitin in fact improved joint function.  *Id.* at 511.  Given the split in the scientific community, the District Court dismissed the action, reasoning that the Complaint failed to make plausible the actual falsity of the claim.  *Id.* at 511–12.  In affirming the district court decision, the Fourth Circuit emphasized that where "litigants concede that some reasonable and duly qualified scientific experts agree with a scientific proposition, they cannot also argue that the proposition is 'literally false.'"  *Id.* at 515; *see also De Simone v. VSL Pharms., Inc*, 395 F. Supp. 3d 617, 626 (D. Md. 2019), *aff'd sub nom. De Simone v. Alfasigma USA, Inc.*, No. 19-1731, 2021 WL 613697 (4th Cir. Feb. 17, 2021) ("In the absence of a concession that the statement is the subject of reasonable scientific debate, that question is properly decided by the jury.").

---

[8]  A consumer relies on an omission or misrepresentation, if "the consumer would not have made the choice in question had the commercial entity disclosed the omitted information," or where the misrepresentation substantially induces the consumer's choice.  *Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 532 (D. Md. 2011).  Metague avers that Woodbolt's misrepresentations prompted him to buy the product he otherwise would not have purchased.  ECF No. 16 ¶¶ 89, 105–06.  Reliance, therefore, has been established.

But that is not this case.  The Amended Complaint makes plausible essentially unanimous scientific agreement that XTEND substantially exceeds the per-serving calories listed and advertised.  Metague tested the caloric content of XTEND using every available FDA-approved method, and for each, the calories simply did not support calling the supplement a "zero calorie" product.  By contrast, nothing in the Amended Complaint nods to any debate or dispute as to how calorie content is measured or that XTEND is in fact not a "zero calorie" supplement.  Thus, the falsity of the "zero-calorie" label is clearly pleaded.

Woodbolt alternatively maintains that the fraud claims must be dismissed for failure to make plausible any "actual injury or loss."  ECF No. 19-1 at 37 (citing *Lloyd v. General Motors Corp.*, 397 Md. 108, 157 (2007); *Van Buren v. Walmart Inc.*, No. DKC-19-0911, 2020 WL 1064823, at *7 (D. Md. March 5, 2020); *Currie v. Wells Fargo Bank, N.A.*, 950 F. Supp. 2d 788, 796 (D. Md. 2013)).  To state a claim for common law fraud, a plaintiff must demonstrate that he "suffered compensable injury resulting from [the defendant's] misrepresentation."  *Van Buren,* 2020 WL 1064823, at *7.  Where a plaintiff avers fraudulent inducement to purchase a product, economic loss alone is sufficient injury to allow the claim to proceed.  *See Superior Bank, F.S.B. v. Tandem Nat'l Mortg., Inc.,* 197 F. Supp. 2d 298, 310–311 n. 22 (D. Md. 2000); *Next Generation Grp., LLC v. Sylvan Learning Cents., LLC*, No. CCB-11-0986, 2012 WL 37397, at *4 n. 5 (D. Md. Jan. 5, 2012); *cf. Hoffman v. Stamper*, 385 Md. 1, 36–37 (2005) (explaining fraud is an economic tort "in the nature of a breach of contract" and thus the appropriate measure of injury and damages is pecuniary loss).  This is the very nature of the loss pleaded in the Amended Complaint.  Metague and the class were duped into buying XTEND because it claimed

to be zero-calorie when it is not, and that the out-of-pocket costs alone to buy the product is sufficient injury to sustain the claims.  The fraud claims will not be dismissed. [9]

### IV. Conclusion

For the foregoing reasons, Woodbolt's motion to dismiss is GRANTED with respect to Counts I and II for failure to provide pre-suit notice, Count IV for failure to allege future injury, and Count VII as to Metague only.  The Court recognizes that Metague has requested leave to amend the Amended Complaint to cure any identified deficiencies.  The Court reserves on that request.  The Court will hold a recorded status conference to address matters related to the orderly progression of this case, to include scheduling (a) Woodbolt's Answer to the Amended Complaint; (b) possible amendment of pleadings; (c) class discovery and motions for Rule 23 certification; and (d) merits discovery.

A separate order follows.


_____06/16/2021_____                    _____/S/_____
Date                                         Paula Xinis
                                          United States District Judge


---

[9] The MCPA claim (Count V) survives challenge for the same reasons.  *See Currie*, 950 F. Supp. 2d at 796 (quoting *Stewart v. Bierman*, 859 F. Supp. 2d 754, 768 (D. Md. 2012)) (explaining that a plaintiff must demonstrate that a defendant's "unfair or deceptive practice or misrepresentation" "cause[d] [him] actual injury."); *Cf. Lloyd*, 397 Md. 108 at 149 n. 17 ("in order to allege a loss under the consumer protection act, the [plaintiffs] need only articulate some manifestation of loss").